**PAETEC** COMMUNICATIONS | *passionate about quality*℠

November 19, 2003

<u>Via Overnight and Electronic Mail</u>

Louise E. Rickard, Acting Executive Secretary
Department of Public Utility Control
10 Franklin Square
New Britain, Connecticut 06051

    Re:    Docket 01-08-19RE02 –
              Petition of PaeTec Communications, Inc. for Resolution of Disagreement
              with Southern New England Telephone Company - Second Reopening

Dear Secretary Rickard:

    PAETEC Communications, Inc. ("PAETEC") herein files its **WRITTEN COMMENTS** addressing Section 3.2.1 of the Amendment to the Interconnection Agreement, as authorized by the Department's Ruling on Motion No. 1 in the above-captioned proceeding on November 12, 2003.

    Service is being made pursuant to Section 16-1-15 of the Regulations of Connecticut State Agencies.

    Should there be any questions concerning this submission, please do not hesitate to contact me.

                                       Very truly yours,

                                       T. Ambrosi
                                       Vice President, Carrier and Government Relations
                                       PAETEC Communications, Inc.
                                       600 Willowbrook Office Park
                                       Fairport, NY 14450
                                       (585) 340-2528

                                       Michael J. Goldey, Its Attorney
                                       81 Highfield Road
                                       Harrison, NY 10528
                                       (914) 967-3312

cc:    Robert L. Marconi, Esq.
        Assistant Attorney General
        Office of The Attorney General
        10 Franklin Square
        New Britain, CT 06051-2605

STATE OF CONNECTICUT
DEPARTMENT OF PUBLIC UTILITY CONTROL

| | | |
|---|---|---|
| PETITION OF PAETEC | : | DOCKET NO. 01-08-19RE02 |
| COMMUNICATIONS, INC. FOR | : | |
| RESOLUTION OF DISAGREEMENT | : | |
| WITH SOUTHERN NEW ENGLAND | : | |
| TELEPHONE COMPANY - | : | |
| SECOND REOPENING | : | November 19, 2003 |

WRITTEN COMMENTS OF PAETEC COMMUNICATIONS, INC.

PAETEC Communications, Inc. ("PAETEC") herein submits its Written Comments addressing the issue referred back to the Department of Public Utility Control ("DPUC" or "Department") at the suggestion of the United States District Court, Connecticut, in its Ruling of September 30, 2003 *("USDC Ruling")*,[1] in the federal court appeal of the DPUC's Final Decision of May 1, 2002, in DPUC Docket No. 01-08-19 *("Decision")*.

By its *Ruling on Motion No. 1* in the above-captioned proceeding, the Department on November 12, 2003, granted the Southern New England Telephone Company's ("SNET") request that the Department revise the time schedule in its *Decision* of October 29, 2003, and permit comments to be filed by the parties before the Department issues its Reopening Decision scheduled for November 25, 2003.

---

[1] *Southern New England Telephone Company v. State of Connecticut, DPUC, et al.*, Ruling on Motions for Summary Judgment in Civil Action No. 3-02-CV-1022 (JCH), 2003 U.S. Dist. LEXIS 17473 (Sept. 30, 2002) *("USDC Ruling")*.

## I.   INTRODUCTION AND BACKGROUND

1.   The Department granted SNET's Motions to reopen this proceeding to consider the sole issue authorized to be referred back to the Department pursuant to the suggestion of the federal court in the *USDC Ruling*.[2] The Department "reopen[ed] the instant docket for the limited purpose of specifically addressing Section 3.2.1 of the parties' Amendment in light of the entirety of the Decision."[3]

2.   In the *USDC Ruling*, the Court indicated it had considered Section 3.2.1, "combined with other aspects and provisions" of the interconnection agreement, and was "*inclined to reach the same conclusion as the DPUC did: the calls at issue are indeed included in local traffic by the Amendment and made subject to reciprocal compensation*" (emphasis supplied; footnote omitted).[4] However, because the DPUC did not explicitly mention Section 3.2.1, the court issued a stay so that the DPUC could explicitly address the issue.

3.   The court's full discussion of Section 3.2.1 makes this clear:

> The court is concerned, however, that the DPUC's Decision nowhere mentions Section 3.2.1 or the significant issue of the construction of its carve out of "interLATA toll." Even the deferential "arbitrary and capricious" standard requires the agency to have examined the relevant data." *Public Citizen, 340 F.3d at 53*. On the other hand, given the Act's definition of "telephone toll service" as "telephone service between stations in different exchange areas for which there is made a *separate charge not included in contracts with subscribers* for exchange service," 47 U.S.C. 153(48)(emphasis added), combined with other aspects and provisions of the parties' interconnection agreement, including Section 3.2.1, this court is inclined to reach the same conclusion as the DPUC did:  the calls at issue are indeed included in local traffic by the Amendment and made subject to reciprocal compensation. n4

---

[2] *See* SNET's formal Request for a Time Schedule, dated October 15, 2003, and SNET's formal Request to Reopen the Instant Proceeding and Request for a Time Schedule, dated October 20, 2003.

[3] DPUC *Decision*, October 29, 2003, p. 2.

[4] *USDC Ruling, op. cit.*, at *29

PAETEC Comments, November 19, 2003, DPUC Docket No. 01-08-19RE02                               2

> n4 The Virtual FX calls at issue here are clearly "interLATA calls," but do not appear to be "interLATA toll" calls because no separate charge is made to SNET's subscribers for this traffic, though the court leaves that determination to the DPUC if it chooses to address the matter.

> While the court could itself interpret the contract, . . .the Act assigns to state commissions a primary role in implementing its provisions. . . . the [FCC's] 2001 Ruling still explicitly reserves to state commissions the power to interpret pre-existing interconnection agreements to determine whether the parties made the type of traffic in dispute here subject to reciprocal compensation. *16 F.C.C.R. at 9189.*
> In light of these considerations and the DPUC's comparative expertise on interconnection agreements, the court believes that the better course is to stay this action to allow the parties in interest to request that the DPUC reopen the proceeding to consider the issue in light of Section 3.2.1 of the Amendment.[5]

4. Accordingly, although the court's inclination to affirm the DPUC's decision is clearly correct, PAETEC will discuss in greater detail why SNET's argument that Section 3.2.1 of the Amendment somehow excludes PAETEC's virtual FX traffic from reciprocal compensation is clearly wrong and inconsistent with the terms of the Amendment.

## II.  SUMMARY OF PAETEC'S POSITION

5. The Department was correct in its determination that the virtual FX traffic at issue must be included in local traffic subject to reciprocal compensation. On a stand-alone basis and without regard to Section 3.2.1, Section 3.1 of the Amendment requires this result. First, under the Amendment[6] to the PAETEC/SBC 13-State Interconnection Agreement,[7] virtual FX traffic, as defined in Section 3.1 of the Amendment, *"shall be . . . treated as Local for purposes of compensation."* This contractual requirement is absolute and not modified in

---

[5] *USDC Ruling, op. cit.,* at *28-30.

[6] *See* Docket No. 01-01-16, *Application of the Southern New England Telephone Company for Approval of Agreement for Network Interconnection and Resale with PaeTec Communications, Inc.,* "Amendment to PaeTec Communications, Inc. Superceding Certain Compensation, Interconnection and Trunking Provisions," dated Jan. 19, 2001 (DPUC Decision, June 13, 2001) ("Amendment").

[7] *See* Docket No. 01-01-16, *Application of the Southern New England Telephone Company for Approval of Agreement for Network Interconnection and Resale with PaeTec Communications, Inc.,* filed with the DPUC on January 8, 2001(DPUC Decision, April 18, 2001) ("Interconnection Agreement").

any manner by Section 3.2.1.[8] In addition, Section 3.2.1 of the Amendment can not and does not exclude virtual FX traffic from reciprocal compensation. As defined in the Amendment, "virtual FX" traffic is not "interLATA FX traffic" as defined in the 13-State Agreement, and it clearly is not "interLATA toll." Under the Amendment to the PAETEC/SBC 13-State Interconnection Agreement, "virtual FX" traffic, as defined in Section 3.1 of the Amendment, must "be treated as local for purposes of mutual compensation."

6. Section 3.1 of the Amendment, in absolute terms and without any exception, requires that virtual FX traffic "shall be . . . treated as Local for purposes of compensation." Section 3.1 does not say that virtual FX traffic is in fact "local" traffic under the 1996 Act, or SNET's tariffs, or FCC decisions, or general industry practice. These issues are all irrelevant, as the absolute requirement of Section 3.1 is that virtual FX traffic *"shall be . . . treated as Local for purposes of compensation."* Thus, Section 3.1 is not limited in any way by the exclusions of Section 3.2.

7. Moreover, the exclusions listed in Section 3.2.1 - particularly the exclusion for "interLATA toll" relied on by SNET, is not applicable to the virtual FX traffic at issue under the terms of Section 3.2.1. Under the statutory definition as well as commonly accepted industry definitions, and pursuant to the terms and conditions of the Amendment and the Interconnection Agreement, virtual FX traffic is not and does not constitute interLATA toll traffic. SNET's use of creative labeling such as "toll substitute" or "reverse toll service" are

---

[8] The Amendment has two specific provisions requiring either SNET or PAETEC to pay reciprocal compensation to the other for exchanged compensable traffic that terminates on the other's network. Included within "Compensable Traffic" were two broad non-exclusive classifications of traffic: (i) all "Virtual Foreign Exchange traffic (*see* Amendment, Section 3.1); and (ii) all "traffic terminated to Internet Service Providers" (*see* Amendment, Section 3.2).

Section 3.2 of the Amendment provides: "3.2 Local, Mandatory Local and Optional EAS traffic eligible for reciprocal compensation *will be combined with traffic terminated to Internet Service Providers (ISPs) to determine the total Compensable Local Traffic* and the balance of traffic between the Parties." (Emphasis supplied) The exclusions of Section 3.2.1, 3.2.2 and 3.2.3 apply only to ISP traffic under Section 3.2.

PAETEC Comments, November 19, 2003, DPUC Docket No. 01-08-19RE02                                    4

insufficient to transform virtual FX traffic into interLATA toll. Moreover, even if the carefully limited and defined "virtual FX" traffic in Section 3.1 could somehow be magically considered as "interLATA FX traffic" or "interLATA Feature Group A" traffic, as proposed by SNET: (a) the definitions of these other types of traffic in the Interconnection Agreement are inconsistent with the definition of virtual FX in Section 3.1; and (b) their billing is inconsistent with the billing for "virtual FX" traffic as defined in Section 3.1 of the Amendment. Under Section 1.1 of the Amendment, any "inconsistencies between the provisions of the Amendment and other provisions of the . . . Interconnection Agreement . . . will be governed by the provisions of this Amendment."

III. **Section 3.1 of the Amendment, in Absolute Terms and Without Any Exception, Requires that Virtual FX Traffic Shall Be Treated as Local for <u>Purposes of Compensation. Section 3.1 Is Not Limited By Section 3.2.</u>**

8.  Section 3.1 of the Amendment defines "Local traffic" for purposes of reciprocal compensation as including "Virtual Foreign Exchange" traffic:

> If PaeTec Communications, Inc. designates different rating and routing points such that traffic that originates in one rate center terminates to a routing point designated by PaeTec Communications, Inc. in a rate center that is not local to the calling party even though the called NXX is local to the calling party, such traffic ("Virtual Foreign Exchange" traffic) *shall be* rated in reference to the rate centers associated with the NXX prefixes of the calling and called parties' numbers, but *treated as Local traffic for purposes of compensation.* (Emphasis supplied)

9.  It is clear from the Department's *Decision* that it accorded proper weight to Sections 1.1, 3.1, and 3.2 of the Amendment and the terms of the underlying 13-State Interconnection Agreement. SNET however alleged before the Connecticut United States District Court ("USDC") that the DPUC "failed to even apply rudimentary principles of contract interpretation" and "that the Department cursorily discarded the Interconnection Agreement," implicitly found "that the Amendment superseded the parties' Interconnection

Agreement in its entirely", and "dismissed controlling provisions of the underlying Interconnection Agreement, and even controlling and corresponding sections and subsections in the Amendment at issue."[9] The primary subsection of the Amendment SNET relied on in making these allegations was Section 3.2.1.

10.    None of these allegations stand up to analysis. It is clear that the DPUC correctly applied standard principles of contract law and did not dismiss any "controlling provisions" of Section 3.2 of the Amendment or the underlying 13-State Interconnection Agreement. Indeed, it is clear that all of the Interconnection Agreement provisions characterized by SNET as controlling have been made irrelevant by or are inconsistent with Section 3.1 of the Amendment and are superseded under Section 1.1 of the Amendment. Sections 1.1 and 3.1 of the Amendment contain the "controlling provisions" and have superseded any inconsistent provisions in the underlying 13-State Interconnection Agreement. The Section 3.2.1 exclusion is not applicable on its face as virtual FX is not "interLATA toll"; SNET's misguided attempt to force PAETEC's virtual FX traffic into definitions of interLATA FX or FGA must also fail as the ordering, provisioning, and billing of these services are inconsistent with the ordering, provisioning, and billing of virtual FX, and under Section 1.1 such provisions are superseded as inconsistent with Section 3.1.

11.    The Department properly recognized the relevance of Section 1.1 of the Amendment in its *Decision* of May 1, 2002, rejecting SNET's Feature Group A arguments (*i.e.*, that virtual FX is the equivalent of interLATA FX, which is provisioned as Feature Group A, which is the equivalent of interLATA toll). *Decision,* pp. 6-7. The Department in essence has already addressed and rejected SNET's Section 3.2.1 exclusion argument. The *Decision* repeatedly stressed that only limited, affected provisions of the Interconnection

---

[9] SNET Memorandum of Law, Connecticut USDC, pp. 17-18.

Agreement were being superseded as inconsistent with the Amendment.[10] All of the Interconnection Agreement provisions SNET relied on to oppose the *Decision* - including Interconnection Agreement definitions of interLATA FX and FGA - are in fact "inconsistencies" under Section 1.1 of the Amendment and are superseded by Amendment provisions.

12. The terms of the Amendment are clear and unambiguous. There is no indication in the Amendment, when read in the context of the Interconnection Agreement and the Amendment as a whole, that the phrase "total Compensable Local Traffic" was meant to exclude any geographical type of virtual FX traffic, be it intrastate intraLATA, intrastate interLATA, or *inter*state *inter*LATA. In its *Decision* the DPUC clearly held that the interLATA Virtual FX traffic at issue had to be "treated as Local for purposes of compensation" pursuant to the terms of Section 3.1 of the Amendment, as it met the definition of "Virtual FX traffic" in Section 3.1. Additionally, no other provision of the Amendment was inconsistent with this holding.

13. The clear and unambiguous language of the Amendment demonstrates that so long as traffic meets the Section 3.1 definition of Virtual FX traffic - i.e., so long *as "the called NXX is local to the calling party"* - then "such traffic ("Virtual Foreign Exchange" traffic) *shall be . . . treated as Local traffic for purposes of compensation.*"[11] Section 3.1 explicitly permits PAETEC to terminate the Virtual FX traffic at any location without

---

[10] Findings of Fact 5 of the Final Decision (at p. 9) provides: "The Amendment supersedes the underlying Agreement2 *for all those items addressed* in the Amendment."

[11] Clearly, as understood throughout the industry, with a bona fide "interLATA toll" call, as utilized in Section 3.2.1, the "called NXX" would never be "local to the calling party" and there would be a separate charge per call not associated with local exchange service. For interLATA toll calls, it is clear that the dialing sequence is always 10-digits (NPA-NXX-XXXX), not the 7-digit local call dialing sequence typically utilized by SNET customers placing a local virtual FX call.

geographic restriction so long as the Virtual FX traffic "terminates to a routing point designated by PaeTec Communications, Inc. *in a rate center that is not local to the calling party* even though the called NXX is local to the calling party" (emphasis supplied). PAETEC is free to terminate the traffic to any intraLATA or interLATA location. PAETEC's choosing of a routing point in New York for Connecticut Virtual FX traffic is consistent with and permitted by Section 3.1, and PAETEC's entitlement to compensation is not excluded by Section 3.2.1. Indeed, SNET has admitted that Section 3.1 includes interLATA FX traffic[12] - its subsequent attempts to exclude such traffic under Section 3.2.1 do not withstand analysis.

14. The determinative language of Section 3.1 is that calls meeting the definition of Virtual FX traffic shall be *treated as Local for purposes of compensation.* There is no provision in Section 3.2, or anywhere else in the Amendment, limiting the virtual FX traffic qualifying for reciprocal compensation to intraLATA traffic or intrastate traffic. Section 3.1 is open-ended and without restriction. The Section 3.2 exclusions are limited, precise, and unambiguous, and are not applicable. SNET's tortured attempts to apply other provisions of the Amendment and other definitions of the Interconnection Agreement purportedly excluding interLATA Virtual FX traffic fail due to controlling definitions of "Telephone Toll Service" in the 1996 Act, 47 U.S.C. § 153(48), and Section 1.1 of the Amendment, which specifies that the Amendment governs in case of inconsistencies between it and the Interconnection Agreement.

15. In summary, the unambiguous and definitive Amendment language: (1) requires that any inconsistencies between the provisions of the Amendment and those of the 13-State Interconnection Agreement "will be governed by the provisions of this Amendment"

---

[12] "Thus, while Section 3.1 provides that Virtual FX traffic will be treated as Local (*conceivably encompassing both intraLATA and interLATA*), Section 3.2.1 provides that interLATA toll and IXC-carried intraLATA toll are, in fact, excluded." (Emphasis supplied) SNET Memorandum of Law, Connecticut USDC, p. 24.

(Section 1.1); (2) provides that all Virtual FX traffic shall be treated as Local for purposes of compensation (Section 3.1); and (3) contains limited, precise, and unambiguous exclusions from "Compensable Local Traffic" that are inapplicable to the interLATA virtual FX traffic at issue (Section 3.2). Any fair and reasonable construction of the words used, sensibly applied to the subject matter of the contract, requires reciprocal compensation for the interLATA virtual FX traffic at issue. As the Department correctly held in its *Decision*, the intent within the four-corners of the agreement is that *"Local traffic for purposes of compensation"* includes interLATA Virtual FX traffic as well as intraLATA Virtual FX traffic.

IV.     **The Exclusions Listed in Section 3.2 - Particularly the Section 3.2.1 Exclusion of "InterLATA Toll", Are Not Applicable to the Virtual FX Traffic at Issue and Do Not Disqualify the Virtual FX Traffic From Reciprocal Compensation**

16.     SNET argues that the provisions of Section 3.2.1 of the Amendment somehow disqualify Virtual FX traffic, otherwise required to be "treated as Local traffic for purposes of compensation" under Section 3.1, from reciprocal compensation. However, nothing in Section 3.2 detracts from PAETEC's entitlement to reciprocal compensation. Section 3.2, by definitive and limited contractual language defines what is to be excluded from Compensable Local Traffic. The exclusions are precise and unambiguous; none applies to the Virtual FX traffic at issue.

17.     The Section 3.2 exclusions are limited to interLATA toll (Section 3.2.1), IXC-carried intraLATA toll (Section 3.2.1), intraLATA toll (Section 3.2.2), Originating 8YY traffic (Section 3.2.2), and SBC-transited minutes of use (Section 3.2.3). By definition none of these exclusions apply to Virtual FX traffic. Moreover as shown in Section VI of these Written Comments, the limited Section 3.2.2 "Originating 8YY traffic" exclusion

demonstrates that virtual FX traffic was not intended to be excluded. Under any fair and reasonable construction or interpretation of the Amendment, none of these Section 3.2 provisions exclude Virtual FX local traffic that is then extended intrastate interLATA or interstate interLATA.

18. SNET's argument that Section 3.2.1 excludes virtual FX traffic must fail. The Virtual FX traffic is not "*Inter*LATA toll" as that term is used in Section 3.2.1. The 13-State Interconnection Agreement and Telecommunications Act of 1996 definitions establish this principle. In support of its claim as to why Virtual FX traffic is somehow purportedly "*inter*LATA toll", SNET in its Memorandum of Law to the Connecticut USDC referenced only *General Terms and Conditions, "Definitions" §1.1.64*, of the Interconnection Agreement and §3(21) of the Telecommunications Act, 47 U.S.C. § 153(21), as follows:[13]

"§ 1.1.64 "**InterLATA**" is As Defined in the Act." The 1996 Act defines "**InterLATA Service**" as "telecommunications between a point located in a local access and transport area and a point located outside such area." 47 U.S.C. §153(21).

19. However, these two definitions can not directly or indirectly transform PAETEC's Virtual FX traffic into "InterLATA toll" excluded by Section 3.2.1. The end-to-end Virtual FX traffic may be "interLATA", but it clearly is not "toll." Significantly, SNET in its pleadings before the Connecticut USDC initially ignored the Interconnection Agreement's *General Terms and Conditions* and the 1996 Act's definitions of "toll service" that give full meaning to the term "interLATA toll" as used in Section 3.2.1. These definitions alone defeat SNET's claim that the Virtual FX traffic at issue is interLATA toll.

20. First, the Interconnection Agreement's definition of "Telephone Toll Service" relies on the definition in § 3(48) of the 1996 Act, 47 U.S.C. §153(48), as follows:

"§1.1.130 **"Telephone Toll Service"** is As Defined in the Act." *General Terms and Conditions, "Definitions" §1.1.130* (Tab 3 to SNET's Memorandum of Law). The Telecommunications Act defines "Telephone toll service" as "telephone service between stations in different exchange areas for which there is made *a separate charge not included in contracts with subscribers for exchange service.*" 47 U.S.C. § 153(48). (Emphasis supplied) Even conceding that the Virtual FX traffic at issue is "interLATA service" under 47 U.S.C. §153(21) - since calls from the Connecticut LATA terminate on ISP servers in the Albany, New York LATA - they are not "interLATA *toll* service" or toll traffic under 47 U.S.C. §153(48). The record repeatedly demonstrates with regard to PAETEC's Virtual FX traffic, that the SNET customer placing the call does not incur "*a separate charge* not included in [SNET's] contracts with subscribers for exchange service."[14] The Connecticut USDC however recognized this as a fatal flaw in SNET's approach.[15]

V.  **SNET Ignores Overriding and Binding Provisions in the Amendment Regarding Virtual FX Traffic When It References Inconsistent Definitions of Foreign Exchange Service and Feature Group A Calls In the 13-State Interconnection Agreement**

---

[13] *See* SNET Memorandum of Law, Connecticut USDC, p.22.

[14] The virtual FX traffic also is not "IXC-carried intraLATA toll" as used in Section 3.2.1 of the Interconnection Agreement. No interexchange carrier ("IXC"), is involved with the Virtual FX call. The only two carriers on the call are SNET, which delivers its customer's "local" call (*i.e.*, where the called NXX is local to the calling NXX) to the PAETEC point of interconnection ("POI") in Connecticut, and PAETEC, which then delivers the call to the ISP in Albany. There is no IXC and no toll service - Virtual FX is not IXC-carried intraLATA toll.

[15] *USDC Ruling, op. cit.*, at *28-29. "On the other hand, given the Act's definition of "telephone toll service" as "telephone service between stations in different exchange areas for which there is made a *separate charge not included in contracts with subscribers* for exchange service," *47 U.S.C. 153(48)*(emphasis added), combined with other aspects and provisions of the parties' interconnection agreement, including Section 3.2.1, this court is inclined to reach the same conclusion as the DPUC did: the calls at issue are indeed included in local traffic by the Amendment and made subject to reciprocal compensation. n4"
>   n4  The Virtual FX calls at issue here are clearly "interLATA calls," but do not appear to be "interLATA toll" calls because no separate charge is made to SNET's subscribers for this traffic, though the court leaves that determination to the DPUC if it chooses to address the matter.

21. SNET attempted before the USDC to obfuscate the clear meaning of the Amendment by referring to other definitions in the *General Terms and Conditions* of the Interconnection Agreement and then arguing that the parties would have "also sought to modify" these definitions if the Virtual FX language in Section 3.1 was intended to also permit interLATA Virtual FX to be included as compensable local traffic and overcome the exclusions of Section 3.2.1. *See* SNET's Memorandum of Law before the Connecticut USDC, pages 22-24.

22. However, as demonstrated in Section III, *supra,* Section 3.1 is clear on its face and does not require modification of these other inconsistent definitions. Section 3.1 defines "Virtual FX" traffic as *any* instance where "traffic that originates in one rate center terminates . . . in a rate center that is not local to the calling party, even though the called NXX is local to the calling party . . ." and that in such case the Virtual FX traffic "shall be . . .treated as Local traffic for purposes of compensation."

23. Section 3.1 of the Amendment supersedes inconsistent provisions of the earlier Interconnection Agreement, such as the "Foreign Exchange" and "Feature Group A" provisions SNET has suggested the parties would have also sought to modify. Section 1.1 of the Amendment explicitly requires that any inconsistencies between the provisions of the Amendment and other provisions of the Interconnection Agreement will be governed by the provisions of the Amendment. The superseded Foreign Exchange (FX) and Feature Group A Interconnection Agreement provisions contain language directly contradicted by Section 3.1 of the Amendment.

24. For example, with regard to interLATA FX, the definition states that "the intercarrier compensation mechanism is the same as FGA."[16] However, Section 3.1 clearly and unequivocally specified a different compensation mechanism - reciprocal compensation - for Virtual FX.[17] The superseded "Feature Group A (FGA)" definition discusses FGA intercarrier compensation mechanisms for End Users who have purchased switched access FGA service from the tariffs of either Party.[18] Here again, with regard to the Virtual FX traffic at issue: (i) SNET's end user customers purchase local exchange service from SNET, not carrier access service, for delivery of their local calls (*i.e.*, where the called PAETEC NXX is local to the calling NXX); (ii) SNET billed its end users local exchange rates pursuant to its exchange tariff; it never billed them switched access FGA service; and (iii) PAETEC has never ordered switched FGA service from SNET with regard to the virtual FX service at issue, and SNET never billed PAETEC for switched access FGA service for the virtual FX traffic at issue.

25. It is fatal to SNET's position that PAETEC does not purchase FGA access service from SNET and SNET has never billed PAETEC switched access FGA service for the traffic in question. Indeed, for the ISP-bound Virtual FX calls at issue here, the DPUC has unequivocally ruled that access charges are not appropriate. *See DPUC Investigation of the Payment of Mutual Compensation for Local Calls Carried Over Foreign Exchange Service Facilities, Decision on Motion No. 13*, Docket No. 01-01-29 (April 25, 2002).

---

[16] See Interconnection Agreement, *General Terms and Conditions, "Definitions"* § 1.1.56, *Foreign Exchange* (SNET's Memorandum of Law to Connecticut USDC, pp. 22-24 and Tab 3).

[17] Moreover, whereas SNET has conceded that "intraLATA virtual FX was intended to be included as compensable local traffic" (SNET Memorandum of Law, p. 23), the §1.1.56 definition of Foreign Exchange also contains inconsistent provisions providing for meet-point billing arrangements for IntraLATA FX.

[18] [18] See Interconnection Agreement, *General Terms and Conditions, "Definitions"* §1.1.43, *Feature Group A* (SNET's Memorandum of Law to Connecticut USDC, pp. 22-24 and Tab 3).

26.  In summary, both the "InterLATA FX" and the "Feature Group A" provisions also clearly are inconsistent with Section 3.1 and are not applicable. There was no requirement and no reason for PAETEC and SBC to seek to modify these definitions when the Amendment was being negotiated. The DPUC clearly considered and rejected SNET's arguments concerning FX and FGA definitions under the Interconnection Agreement (DPUC *Decision*, pp. 6-7); the DPUC found SNET's arguments unconvincing and the definitions superseded, in any case, as inconsistent with terms of the Amendment.

VI.  **Any SNET Assertion that InterLATA FX Is a "Toll Substitute" or "Reverse Toll Service," and Therefore the Equivalent of InterLATA Toll, and Therefore Excluded By Section 3.2.1 From "Total Compensable Local Traffic" Must Be Rejected**

27.  SNET continues to argue that "virtual FX" traffic under Section 3.1 somehow meets the 13-State Interconnection Agreement's definition of "interLATA FX" traffic, and that in such case "[t]he issue at hand is whether interLATA FX traffic constitutes interLATA toll traffic and is thus subject to exclusion from reciprocal compensation" under Section 3.2.1.[19] It now appears that before the Department SNET has modified its position and may argue in a complicated four-step: (i) that PAETEC's virtual FX traffic, because it is interLATA, is the equivalent of "interLATA FX;" (ii) that interLATA FX is the equivalent of "interLATA toll" because interLATA FX can be used as a "toll substitute;" (iii) that since interLATA toll is excluded by Section 3.2.1 then interLATA FX (the toll substitute) must also be excluded; and (iv) that therefore the "virtual FX" traffic at issue must be excluded. This is just sophistry. The SNET customer placing the call to an NXX within that customer's local calling area has ordered only local exchange service in connection with the call, and is billed only for local calling by SNET under its exchange tariff. The SNET customer has not ordered

and is not billed for an FX, FGA, or toll service. The PAETEC ISP customer has not ordered and is not billed for an FX, FGA, or toll service. Whether or not the virtual FX is used as a toll substitute does not turn the PAETEC virtual FX into a traditional SNET interLATA FX service, and clearly not into an interLATA toll service under the Interconnection Agreement, the 1996 Act, or Section 3.2.1.

28. Finally, even if SNET were correct - which it is not - that for some purposes PAETEC's virtual FX service can be considered as a toll substitute and the equivalent of interLATA toll - which it is not - the fact remains that Section 3.1 of the Amendment precludes any exclusion of the virtual FX traffic from mutual compensation. In absolute terms Section 3.1 states that so long as the traffic is provided in the manner specified:

> such traffic ("Virtual Foreign Exchange" traffic) *shall be* rated in reference to the rate centers associated with the NXX prefixes of the calling and called parties' numbers, but *treated as Local traffic for purposes of compensation.* (Emphasis supplied)

29. Accordingly, SNET's convoluted "toll substitute" argument - that PAETEC's virtual FX traffic somehow is interLATA telephone "toll" service - must fail. SNET's argument is strained and unconvincing and inconsistent with the 1996 Act. To give any credence to its claim, SNET first must demonstrate that traditional FX services are classified as "toll" services within the 1996 Act. Since this is impossible, SNET may also be attempting to advance its argument by changing its characterization of interLATA FX services from a "toll substitute" to that of a "reverse toll service," and argue that since the party receiving the call is responsible for "toll charges" (or perhaps some equivalent of "toll charges"), and that the originating caller's local exchange carrier (in this instance SNET) is entitled to access charges for connecting such calls if not the normal local exchange service charge.

---

[19] *See* SNET's Request for a Time Schedule, filed October 15, 2003, n3.

30. This new characterization of traditional FX service must also fail as a basis for excluding virtual FX traffic under Section 3.2.1. First, nowhere does the Amendment or the underlying Interconnection Agreement define or classify virtual FX, or FX services generally, as "reverse toll services." Neither does the 1996 Act. There is no statutory or contractual support for SNET's argument that what it calls "reverse toll services" would constitute "toll" services under the 1996 Act or Section 3.2.1 of the Amendment. Second, even if for some purposes *SNET's* traditional FX services were to be considered as "reverse toll services",[20] PAETEC does not apply a separate per call charge to its virtual FX calls.[21] Thus PAETEC's virtual FX calls can not even be considered reverse toll services.

31. Third, even if for some purposes FX services were to be considered as "reverse toll services," presumably so too would 800-type services, where the party ordering and paying for the "800"-type services and receiving the "800"-type calls is responsible for what might also be considered as "reverse toll charges." However, whereas "800"-type traffic is one of the explicit exclusions in Section 3.2 of the Amendment - Section 3.2.2 excludes "Originating 8YY traffic" from compensable local traffic eligible for reciprocal compensation -- there is no explicit exclusion of FX traffic. The Amendment was explicit when a "reverse toll charge"-type service was intended to be excluded, but that exclusion does not include either traditional FX services or PAETEC's provisioning of virtual FX.

---

[20] It is believed that under SNET's tariffed FX service regulations, a per call charge of some type is imposed on the party receiving the FX call.

## VII. CONCLUSION

It is entirely rational and expected that virtual FX traffic would *not* be excluded by Section 3.2.1 of the Amendment. Section 3.1 in absolute terms had just defined virtual FX traffic and required that it "*shall be* . . . treated as Local traffic for purposes of compensation." The virtual FX traffic as defined in Section 3.1 is unlimited in geographic extent. Under Section 3.1 the virtual FX may be entirely intraLATA, intrastate *inter*LATA, or interstate *inter*LATA, so long as the "traffic that originates in one rate center terminates to a routing point designated by PaeTec Communications, Inc. in a rate center that is not local to the calling party even though the called NXX is local to the calling party."

Section 3.2.1 does not therefore exclude interLATA virtual FX. SNET's strained interpretations and definitions to attempt to force-feed virtual FX traffic into the interLATA toll category fail. To redefine virtual FX as interLATA toll would be inconsistent under both the 1996 Act and Section 1.1 of the Amendment; SNET's attempt to do so must be rejected. Any provisions in the Interconnection Agreement inconsistent with the Amendment must be superseded pursuant to Section 1.1 of the Amendment.

---

[21] PAETEC does not apply any per call charge to its virtual FX service comparable to telephone-toll-services' *separate per call charge to subscribers for exchange service*, which charge is the identifying hallmark of toll service under 47 U.S.C. §153(48).

Respectfully submitted,

**PAETEC COMMUNICATIONS, INC.**

By:_____
Michael J. Goldey, Its
Telecommunications Analytica
81 Highfield Road
Harrison, NY 10528
   Its Attorney
   Tel. No: (914) 967-3312
   m.goldey@mindspring.com

_____
JT Ambrosi
Vice President, Carrier and Gov't Relations
PAETEC Communications, Inc.
1 PaeTec Plaza
600 Willowbrook Park
Fairport, NY 14450
   Tel No: (585) 340-2528
   JTAmbrosi@PAETEC.com

November 19, 2003